**15-25-00209-CV**

ACCEPTED
15-25-00209-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/18/2025 7:46 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-_____

# IN THE COURT OF APPEALS FOR THE FIFTEENTH DISTRICT AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/18/2025 7:46:49 PM
CHRISTOPHER A. PRINE
Clerk

*In re TikTok Inc.; TikTok Ltd.; TikTok Pte. Ltd.;*
*TikTok U.S. Data Security Inc.; ByteDance Ltd.; and ByteDance Inc.,*

**Relators.**

Original Proceeding from the 250th District Court of Travis County, Texas
Cause No. D-1-GN-25-003118
The Honorable Cory Liu

## Petition for Writ of Mandamus

Neema T. Sahni (*pro hac vice*)
nsahni@cov.com
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel. (424) 332-4800
Fax. (424) 332-4749

Brandon Duke
bduke@omm.com
**O'MELVENY & MYERS LLP**
700 Louisiana St., Suite 2900
Houston, TX 77002
Tel.  (832) 254-1500
Fax. (832) 254-1501

Megan A. Crowley (*pro hac vice*)
mcrowley@cov.com
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, DC 20001
Tel. (202) 662-6000
Fax. (202) 778-5112

**ATTORNEYS FOR RELATORS**

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Relators:**
TikTok Inc.; TikTok Ltd.; TikTok Pte. Ltd.; TikTok U.S. Data Security Inc.; ByteDance Ltd.; and ByteDance Inc.

**Counsel for Relators:**
Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067

Megan A. Crowley
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001

Brandon Duke
O'MELVENY & MYERS LLP
700 Louisiana St., Suite 2900
Houston, TX 77002

**Real Party in Interest:**
State of Texas

**Counsel for Real Party:**
Richard McCutcheon
Assistant Attorney General
Consumer Protection Division
808 Travis Street, Suite 1520
Houston, Texas 77002

David H. Thompson
Adam P. Laxalt
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036

ii

**Respondent:**
Judge Cory Liu
250th District Court
Travis County Civil & Family Court
1700 Guadalupe Street
9th Floor
Austin, TX 78701

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ ii

TABLE OF AUTHORITIES ........................................................................... vi

MANDAMUS RECORD ................................................................................ xii

STATEMENT OF THE CASE ....................................................................... xiii

STATEMENT OF JURISDICTION ............................................................... xiv

ISSUES PRESENTED ................................................................................... xv

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ............................................................................... 4

    I.      The TikTok Platform ......................................................................... 4

    II.     The SCOPE Act ................................................................................ 6

    III.    The DTPA ......................................................................................... 9

    IV.    Procedural History .......................................................................... 10

ARGUMENT .................................................................................................. 13

    I.      The trial court abused its discretion in refusing to dismiss the SCOPE Act Claims, despite the State's dispositive concessions. ....... 14

    II.     The trial court abused its discretion by expanding the scope of the DTPA. ............................................................................................... 19

    III.    The trial court abused its discretion by denying Relators immunity under Section 230. ......................................................................... 25

            A.      Section 230 provides broad immunity for publishing decisions. ............................................................................. 25

            B.      Section 230 bars Count IX. ...................................................... 27

            C.      Section 230 bars Counts I-VIII and X. ..................................... 30

    IV.    The trial court abused its discretion by failing to dismiss the DTPA claims under the First Amendment. ................................................. 32

            A.      The DTPA Claims target expressive activity. ......................... 33

             B.      The DTPA claims seek to compel speech. ............................... 35

    V.     An appeal is not an adequate remedy to correct the trial court's abuses of discretion. ....................................................................... 39

CONCLUSION AND PRAYER........................................................................... 41

CERTIFICATE OF COMPLIANCE .................................................................43

CERTIFICATE OF SERVICE ......................................................................... 44

APPENDIX ....................................................................................................45

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*A.B. v. Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024) ............................................................... 26

*In re Acad., Ltd.*,
625 S.W.3d 19 (Tex. 2021) ................................................................... 39

*Angelilli v. Activision Blizzard, Inc.*,
781 F. Supp. 3d 691 (N.D. Ill. 2025) .......................................... 27, 34, 38

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ......................................................... 26, 30

*Beckman v. Match.com, LLC*,
668 F. App'x 759 (9th Cir. 2016) ......................................................... 30

*Bennett v. Google, Inc.*,
2017 WL 2692607 (D.D.C. June 21, 2017) ........................................ 31, 32

*Bogard v. TikTok Inc.*,
2025 WL 604972 (N.D. Cal. Feb. 24, 2025) ........................................ 35

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ............................................................................ 36

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ....................................................................... 33, 38

*Burton v. Prince*,
577 S.W.3d 280 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ............ 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........................................................................... 39

*Comm'n for Lawyer Discipline v. Benton*,
980 S.W.2d 425 (Tex. 1998) .......................................................... *passim*

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ................................................. 8

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
No. 24-50721 (5th Cir. Nov. 3, 2025) ................................................9

*Doe v. Backpage.com*,
817 F.3d 12 (1st Cir. 2016) ................................................27

*Doe v. Grindr*,
128 F.4th 1148 (9th Cir. 2025) ......................................... 28, 29, 30

*Doe v. MySpace*,
528 F.3d 413 (5th Cir. 2008) ......................................... 26, 30

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ......................................... 26, 29, 30

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .........................................37

*In re Essex Ins. Co.*,
450 S.W.3d 524 (Tex. 2014) ......................................... 13, 40

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021) .........................................4, 13, 29, 40

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ......................................... 26, 32

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016) .........................................27

*In re First Rsrv. Mgmt. L.P.*,
671 S.W.3d 653 (Tex. 2023) .........................................25

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ......................................... 27, 28

*In re Geico Cnty. Mut. Ins. Co.*,
2022 WL 17843869 (Tex. App.—Dallas Dec. 22, 2022, no pet.) .........................................25

*Herrick v. Grindr LLC*,
765 F. App'x 586 (2d Cir. 2019) .........................................29

vii

*Holzman v. State*,
  2013 WL 398935 (Tex. App.—Corpus Christi-Edinburg Jan. 31, 2013, pet. denied) ........................................................................24

*Household Retail Servs., Inc. v. State*,
  2001 WL 984779 (Tex. App.—San Antonio Aug. 29, 2001, no pet.) ...............24

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) .................................................................38

*In re John G. & Marie Stella Kenedy Mem'l Found.*,
  315 S.W.3d 519 (Tex. 2010) .................................................................40

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010) .................................................................32

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ...............................................................38

*In re McAllen Med. Ctr., Inc.*,
  275 S.W.3d 458 (Tex. 2008) ..................................................................41

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ................................................................*passim*

*NAACP v. Button*,
  371 U.S. 415 (1963) ..............................................................................15

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ..............................................................................37

*Nat'l Rifle Ass'n of Am.. v. Vullo*,
  602 U.S. 175 (2024) ..............................................................................37

*NetChoice v. Carr*,
  789 F. Supp. 1200 (N.D. Ga. 2025) ..........................................2, 16, 17, 40

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) .........................................................36, 37

*NetChoice, LLC v. Reyes*,
  748 F. Supp. 3d 1105 (D. Utah 2024) ......................................................38

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) ........................................34

*Patterson v. Meta Platforms, Inc.*,
  2025 WL 2092260 (N.Y. App. Div. July 25, 2025)............................34

*Perry v. Del Rio*,
  66 S.W.3d 239 (Tex. 2001) ........................................................ 13

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
  127 F.4th 516 (4th Cir. 2025) ............................................... 27, 28

*In re Prudential Ins. Co. of Am.*,
  148 S.W.3d 124 (Tex. 2004) .............................................13, 39, 40

*Reaves v. City of Corpus Christi*,
  518 S.W.3d 594 (Tex. App.—Corpus Christi–Edinburg 2017,
  no pet.) ................................................................................ 25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988)..................................................................36

*Riverside Nat'l Bank v. Lewis*,
  603 S.W.2d 169 (Tex. 1980)......................................................20

*Snyder v. Phelps*,
  562 U.S. 443 (2011).................................................................38

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
  702 F. Supp. 3d 809 (N.D. Cal. 2023)................................ 28, 29, 32

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
  753 F. Supp. 3d 849 (N.D. Cal. 2024) .................................... 28, 29

*State ex rel. Rosenblum v. TikTok Inc.*,
  2025 Ore. Cir. LEXIS 5135 (Or. Cir. Ct. June 13, 2025) .........28, 29, 31

*Students Engaged in Advancing Tex. v. Paxton*,
  765 F. Supp. 3d 575 (W.D. Tex. 2025) .................................. 8, 15, 18

*Students Engaged in Advancing Tex. v. Paxton*,
  No. 25-50096 (5th Cir. Feb. 21, 2025)...........................................9

*Texas v. Colony Ridge, Inc.*,
2024 WL 4553111 (S.D. Tex. Oct. 11, 2024)......................................24

*TikTok, Inc. v. Eight Jud. Dist. Ct. in & for Cnty. of Clark*,
141 Nev. Adv. Op. 51, 2025 WL 3111587 (Nev. Nov. 6, 2025) ................... 38, 39

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992)....................................................13, 18, 32, 33

*Winter v. Facebook, Inc.*,
2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) ............................................ 30, 31

*Woods v. Littleton*,
554 S.W.2d 662 (Tex. 1977) ............................................................ 21

*Word of Faith World Outreach Ctr. Church, Inc. v. Morales*,
787 F. Supp. 689 (W.D. Tex. 1992)..................................................... 20, 22, 23

*Wozniak v. YouTube, LLC*,
319 Cal. Rptr. 3d 597 (Cal. Ct. App. 2024) ........................................... 29, 30

*Zauderer v. Off. of Disciplinary Couns. for Sup. Ct. of Ohio*,
471 U.S. 626 (1985) .................................................................... 37

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ........................................................... 32

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
525 F. Supp. 3d 1017 (N.D. Cal. 2021) ................................................. 32

**Statutes**

Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501,
*et seq.* ................................................................................ 11

Communications Decency Act, 47 U.S.C. § 230...............................................*passim*

Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41,
*et seq.* ................................................................................*passim*

Securing Children Online through Parental Empowerment Act,
Tex. Bus & Com. Code §§ 509.001, *et seq.* ...............................................*passim*

**Other Authorities**

Lease, *Black's Law Dictionary* (12th ed. 2024)..........................................................21

Lease, *Cambridge Dictionary*.............................................................................21

Order Consolidating Cases, *CCIA v. Paxton*, No. 24-50721,
    *SEAT v. Paxton*, No. 25-50096 (5th Cir. Feb. 21, 2025) ......................................9

Purchase, *Black's Law Dictionary* (12th ed. 2024) ...............................................21

Purchase, *Cambridge Dictionary* ......................................................................21

Recording of Oral Argument, *CCIA v. Paxton*, No. 24-50721
    (5th Cir. Nov. 3, 2025) .....................................................................................9

Tex. R. Civ. P. 91a .....................................................................................*passim*

# MANDAMUS RECORD

A. Plaintiff's Original Petition ................................................................ MR 0001
   (October 3, 2024)

B. Plaintiff's First Amended Petition ..................................................... MR 0020
   (August 19, 2025)

C. Defendants' Rule 91a Motion .............................................................. MR 0100
   (August 22, 2025)

D. Plaintiff's Response to Defendants' Rule 91a Motion ......................... MR 0250
   (September 22, 2025)

E. Defendants' Reply in Support of Rule 91a Motion ............................. MR 0321
   (September 26, 2025)

F. Transcript of Hearing on Rule 91a Motion .......................................... MR 0359
   (September 29, 2025)

G. Defendants' Supplemental Memorandum Addressing State's
   In-Hearing Submission of Authority ..................................................... MR 0462
   (September 30, 2025)

H. Order Denying Defendants' Rule 91a Motion ..................................... MR 0465
   (October 1, 2025)

## STATEMENT OF THE CASE

**Nature of the Case:** This original proceeding arises from the trial court's denial of Relators' Rule 91a motion to dismiss. Relators—TikTok Inc., TikTok Ltd., TikTok Pte. Ltd., TikTok U.S. Data Security Inc., ByteDance Ltd., and ByteDance Inc.—were sued by Real Party in Interest, the State of Texas, which alleges violations of the Securing Children Online through Parental Empowerment ("SCOPE") Act and the Deceptive Trade Practices Act ("DTPA"). Relators argued that the SCOPE Act claims must be dismissed because the Act is unconstitutionally vague, as applied to them. During the hearing on Relators' motion, the State repeatedly admitted it did not know how Relators allegedly violated the SCOPE Act or what the Act's governing liability standard means as applied to them. Relators also argued the DTPA claims fail because TikTok—a free platform—is not a good or service that is purchased or leased for purposes of the DTPA. The trial court, however, ignored the State's concessions regarding the SCOPE Act and adopted the State's expansive interpretation of the DTPA to apply it—for the first time—to conduct that does not and cannot involve any statutory consumers, goods, or services. Relators also argued that the DTPA claims are barred by Section 230 of the Communications Decency Act and the First Amendment.

**Trial Court** Hon. Cory Liu
250th District Court, Travis County, Texas
Cause No. D-1-GN-25-003118

**Proceedings:** Following an oral hearing, Respondent, The Honorable Cory Liu, denied Relators' Rule 91a motion on October 1, 2025. Relators seek mandamus relief from the denial of their Rule 91a motion, by which Respondent declined to dismiss the State's action in its entirety.

## STATEMENT OF JURISDICTION

The denial of a Rule 91a motion to dismiss is reviewable by mandamus. *In re Facebook, Inc.*, 625 S.W.3d 80, 86–87 (Tex. 2021). This Court has jurisdiction to issue a writ of mandamus to correct the trial court's error. Tex. Gov't Code §§ 22.220(d)(1); 22.221(b), (c-1).

# ISSUES PRESENTED

1.      Did the trial court misapply the law, and thus abuse its discretion, in refusing to recognize that the SCOPE Act provisions at issue are unconstitutionally vague as applied to Relators, particularly in light of the State's concessions at oral argument that it does not know "what [Relators] are currently doing that's alleged to be a violation of the Act" or what its standards mean as applied to Relators?

2.      Did the trial court misapply the law, and thus abuse its discretion, by construing the DTPA to regulate conduct that cannot even theoretically affect any statutory "consumer" or involve any "goods" or "services"?

3.      Did the trial court misapply the law, and thus abuse its discretion, by concluding that the State's DTPA claims are not barred by Section 230 of the Communications Decency Act and the First Amendment?

4.      Is an appeal following a plenary trial an inadequate remedy for these abuses of discretion?

## INTRODUCTION

Mandamus relief is necessary to correct the trial court's clear abuse of discretion in allowing the State's claims under the Securing Children Online Through Parental Empowerment ("SCOPE") Act and the Deceptive Trade Practices Act ("DTPA") to proceed. The SCOPE Act claims rest on vague statutory language that, as applied to Relators, denies fair notice and invites arbitrary enforcement—defects the State itself has acknowledged. Indeed, the State conceded in open court it does not know what the statute means or how Relators allegedly violated it. The DTPA claims fare no better and are foreclosed by both Texas and federal law. Allowing these claims to proceed not only disregards controlling precedent but threatens constitutional rights and statutory boundaries. Mandamus is the only adequate remedy.

**SCOPE Act.** At the September 29 hearing on Relators' Rule 91a Motion, the State repeatedly conceded that it does not know what the SCOPE Act requires or how Relators allegedly violated it—insisting that it would need "both discovery and expert testimony" to answer those questions. MR 0430:25–31:9. The State further admitted it did not know what Relators are "doing now" to comply with the statute or "what [they were] supposed to be doing," stating, "I don't have TikTok. I never

1

have." MR 0430:25–31:9. These concessions are dispositive. The State's inability to articulate what conduct violates the SCOPE Act, what "commercially reasonable" (the Act's core liability standard) "means to TikTok," MR 0421:15–16, or "what [Relators] are currently doing that's alleged to be a violation of the Act," MR 0432:13–33:4, confirms that the Act is unconstitutionally vague as applied to Relators. As a matter of constitutional due process, a statute that fails to provide fair notice of prohibited conduct and invites arbitrary enforcement is void for vagueness. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). And courts must apply "a stricter vagueness standard" to laws like the SCOPE Act that are "capable of reaching protected speech." *Id.* at 438. The State's disparate enforcement approach—applying different standards to different platforms—further underscores the Act's constitutional infirmity. *See NetChoice v. Carr*, 789 F. Supp. 1200, 1231 (N.D. Ga. 2025), *appeal filed* No. 25-12436 (11th Cir. July 16, 2025).

Despite these admissions, the trial court denied Relators' motion to dismiss in a single line. The trial court's refusal to dismiss the SCOPE Act claims—despite the State's concessions that it does not know what the statute means or how Relators have violated it and despite its duty to apply a *stricter* vagueness standard—constitutes a clear abuse of discretion.

**DTPA.** The DTPA claims are equally untenable. The State seeks to rewrite the statute to create enforcement authority the Attorney General does not have. The DTPA applies only when a "consumer" purchases or leases "goods" or "services," yet the State advances claims for which there cannot *ever* be a "consumer"—even theoretically—nor any "goods" or "services." *See* Tex. Bus. & Com. Code Ann. § 17.45. TikTok[1] is an indisputably free platform; its users do not "purchase or lease any goods or services" when using the platform as alleged in the amended petition and therefore cannot qualify as consumers. Allowing these claims to proceed would mark the first time the State has applied the DTPA to a free digital platform—an unprecedented and legally unsupported expansion of the statute's reach. The court adopted that expansion without any reasoning and notwithstanding having expressed concern about the "consequences of the [State's] interpretation" at the hearing. MR 0393:6–12.

Even if users could somehow be deemed "consumers," the State's DTPA claims are barred by Section 230 of the Communications Decency Act ("Section 230"), which immunizes online platforms from liability for publishing third-party content. The injunctive relief the State seeks would also impermissibly restrict

---

[1] References to "TikTok" herein, absent additional specification, denote the TikTok platform and business.

Relators' constitutionally protected speech and other expressive activity under the First Amendment. Mandamus relief is thus necessary to correct the trial court's clear abuse of discretion and to restore the DTPA's statutory limits, preserve federal immunity, and protect core constitutional rights. *See, e.g.*, *In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021) (mandamus warranted to protect important substantive rights, including Section 230's immunity from suit).

This Court should review and reverse on the SCOPE Act and DTPA claims.

## STATEMENT OF FACTS

### I.    The TikTok Platform

TikTok is an online platform that enables users to create, share, and view videos. *See* MR 0033. The TikTok app is free to download and use. MR 0027. TikTok Inc., a California corporation with its principal place of business in California, provides the platform in the United States. MR 0030. TikTok users, who must be 13 years or older to access the "regular TikTok app," can interact with content in several ways. *See, e.g.*, MR 0033–34. Central to the TikTok experience is the "For You" feed, which provides personalized content for each user. MR 0034. Users can also search for particular videos or types of content. MR 0034.

TikTok is available on the Apple App Store, which requires developers to complete an age rating questionnaire before making their apps available for

4

download.  MR 0022; MR 0034–35.  Apple's questionnaire requires developers to select the level of frequency for certain categories of content and provides only three possible responses:  "None," "Infrequent/Mild," and "Frequent/Intense." MR 0035.  The Petition alleges that "TikTok" selected the "Infrequent/Mild" option for four categories:  "Profanity or Crude Humor"; "Mature/Suggestive Themes"; "Sexual Content and Nudity"; and "Alcohol, Tobacco, or Drug Use or Reference."  MR 0035 (collectively, "Questionnaire Responses").  Based on these answers, Apple assigned TikTok a "12+" age rating.  MR 0036.  TikTok has a "T for Teen" rating in the Microsoft and Google Play stores, meaning that its content is generally suitable for users 13 and up.  MR 0059-60 (collectively, "Age Ratings").

TikTok's publicly available Community Guidelines ("Guidelines") "inform users about what content TikTok permits" and set forth policies regarding the scope of permissible content on the platform.  MR 0066-68.  TikTok removes content that violates the Guidelines and internal policies.  *See, e.g.*, MR 0041.

TikTok takes a number of measures to protect younger users. For example, TikTok's "Family Pairing" feature "allow[s] 'parents or guardians [to] link their TikTok accounts to their teens' to manage a variety of content, privacy, and well-being settings,'" including "the ability to monitor and limit the amount of time a

5

known minor can use TikTok." MR 0073–74 (second alteration in original). The Petition also discusses other measures, such as:

- Setting a known minor's "account to 'private' by default" and setting the amount of time a known minor can use TikTok to 60 minutes per day by default;

- Prohibiting users under the age of 16 from sending and receiving "direct messages" with other users and, "[f]or users under the age of 16 with public accounts, not displaying the content they post in the 'For You' feed of users with whom they are not 'friends;'"

- Prohibiting users under the age of 18 from going LIVE (*i.e.*, live broadcasting videos from their device); and

- Providing "a more restricted version of TikTok" for "users under the age of 13," where they can then view certain feeds, "like" content, and "create but not post shortform videos."

MR 0072–74.

## II. The SCOPE Act

On September 1, 2024, the SCOPE Act went into effect. The Act imposes requirements on certain "digital service provider[s]," which include "a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity." Tex. Bus. & Com. Code § 509.001(1). Under the Act, providers must require all users to register their age, and anyone who enters an age younger than 18 is considered a "known minor." *Id.* §§ 509.051(a–b).

The Act imposes several requirements and prohibitions regarding "known minors." Under Section 509.101 (the "Verification Requirement"), digital service

6

providers must "verify, using a commercially reasonable method and for each person seeking to perform an action on a digital service as a minor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." *Id.* § 509.101(a). The statute does not define "commercially reasonable," nor does it provide any guidance as to what methods would satisfy that standard. And, as discussed below, the State has conceded it is not clear what this standard means. *See* MR 0434:9–13.

Verification is the predicate for imposing additional statutory requirements and prohibitions on digital service providers. Section 509.052 (the "Data–Sharing Prohibition") states that "[u]nless a verified parent provides otherwise," digital service providers may not (1) allow any under-18 user to make purchases, (2) "share, disclose, or sell the known minor's personal identifying information," (3) "use the digital service to collect the known minor's precise geolocation data," or (4) "use the digital service to display targeted advertising to the known minor." Tex. Bus. & Com. Code § 509.052(2). And, under Section 509.054 (the "Parental Tools Requirement"), digital service providers must "create and provide to a verified parent parental tools to allow the verified parent to supervise the verified parent's known minor's use of [the] digital service." *Id.* § 509.054(a).

7

Even before the SCOPE Act took effect, federal courts had already enjoined key provisions of the law. In *Computer & Communications Industry Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*"), the court barred enforcement of the Act's requirements that providers monitor and filter a minor's exposure to harmful material and ensure algorithms do not interfere with those duties. *See* Tex. Bus. & Com. Code §§ 509.053, 509.056(1). The court held these provisions failed strict scrutiny under the First Amendment, are unconstitutionally vague, and are barred by Section 230. *CCIA,* 747 F. Supp. at 1044. Similarly, in *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575 (W.D. Tex. 2025) ("*SEAT*"), the court enjoined multiple provisions of the SCOPE Act—including its monitoring, targeted advertising, content moderation, and age-verification requirements—as either unconstitutional under the First Amendment or impermissibly vague. *Id.* at 604; *see* Tex. Bus. & Com. Code §§ 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057.[2]

The Attorney General's appeals in *CCIA* and *SEAT* have been consolidated and are currently pending before the U.S. Court of Appeals for the Fifth Circuit. *See*

---

[2] The district court declined to enjoin each challenged provision of the statute only because plaintiffs had not yet shown, at the preliminary injunction stage, that these other provisions were independently unconstitutional when not combined with the enjoined provisions. *SEAT*, 765 F. Supp. 3d at 604 n.18.

Order Consolidating Cases, *CCIA v. Paxton*, No. 24-50721; *SEAT v. Paxton*, No. 25-50096 (5th Cir. Feb. 21, 2025).  At oral argument before the Fifth Circuit, the court repeatedly inquired as to whether the statutory interpretation questions at issue should be certified to the Texas Supreme Court.  Recording of Oral Argument at 15:35–16:30, 25:00–26:05, 34:10–34:40, *CCIA v. Paxton*, No. 24-50721 (5th Cir. Nov. 3, 2025).

### III.   The DTPA

The "underlying purpose[]" of the DTPA is to "protect consumers"—that is, "individual[s] . . .  who seek[] or acquire[] by purchase or lease, any goods or services"—"against false, misleading, and deceptive business practices."  Tex. Bus. & Com. Code Ann. §§ 17.44, 17.45(4).  Consistent with that purpose, it provides a cause of action for "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" and enumerates 34 such acts.  *Id.* §§ 17.46(a), (b).  In Counts I–X, the State claims Relators committed four of these acts: "representing that goods or services have . . . characteristics . . . which they do not have" (*id.* § 17.46(b)(5)); "representing that goods or services are of a particular standard, quality, or grade . . . if they are of another" (*id.* § 17.46(b)(7)); "advertising goods or services with intent not to sell them as advertised" (*id.* § 17.46(b)(9)); and "failing to disclose information concerning goods or services . . . to induce the consumer into

9

a transaction" (*id.* § 17.46(b)(24)). *See* MR 0075–90 (all DTPA claims exclusively alleging violations of Sections 17.46(b)(5), (7), (9), and (24)).

## IV. Procedural History

On October 3, 2024, just one month after the SCOPE Act took effect, the State filed suit in Galveston County against Relators under the new law without any prior outreach or investigation and without specifying how Relators failed to comply with its standards. Following the *SEAT* court's injunction of certain provisions of the SCOPE Act, *see supra* 8–9, the parties agreed that the State would amend its petition to account for the injunction. On January 9, 2025, the State filed a separate action against Relators, also in Galveston County, alleging violations of the DTPA. On March 19, 2025, the SCOPE Act case was transferred from Galveston to Travis County. The parties subsequently agreed to transfer the DTPA case to Travis County, and to consolidate the actions for pretrial purposes. On July 24, 2025, the State filed an amended consolidated petition, which added no detail to the State's SCOPE allegations. On August 13, 2025, over Relators' objection, the court set trial in the case for August 17, 2026.

The State's amended petition alleges three violations of the SCOPE Act ("SCOPE Act Claims"), alleging that Relators failed to implement a "commercially reasonable" verification method (Count XI), improperly disclosed minors' personal

10

information without consent from a "verified parent" (Count XII), and failed to provide "verified parent[s]" with required tools under the Act (Count XIII). The State's amended petition also alleges ten claims under the Texas Deceptive Trade Practices Act ("DTPA Claims"), asserting that TikTok's age ratings and questionnaire responses mislead users about the app's content (Counts I–VIII), that the platform was designed to be addictive and negatively impacts users' mental health, which is not disclosed to users (Count IX), and that its Guidelines do not align with some content available on the platform (Count X).

Relators moved to dismiss all thirteen claims under Rule 91a of the Texas Rules of Civil Procedure. As to the SCOPE Act, Relators argued the claims rely on unconstitutionally vague provisions, as applied to Relators; violate the First Amendment; and are preempted by the Children's Online Privacy Protection Act. Relators also sought dismissal of the DTPA Claims, explaining that TikTok is a free platform and therefore not a "good or service" that can be purchased or leased. They further argued that the claims are barred by Section 230 and the First Amendment.

At the Rule 91a hearing before The Honorable Cory Liu, the court noted the State's repeated failure to explain how Relators allegedly violated the SCOPE Act or what the statute requires. When asked to address "in what manner [Relators] have

11

fallen short," the State responded that it needed discovery and expert testimony to understand how TikTok fails to comply with the statute. MR 0430:22–31:9. The State also conceded that it could not explain what the term "commercially reasonable" means, and that it would need expert discovery to answer that question. MR 0434:9–13. Relators, in urging the court to dismiss the SCOPE Act claims, underscored that the State's concessions that it cannot explain a key term in the Act—"commercially reasonable"—without expert testimony or discovery is the "very definition of vagueness in a statute." MR 0434:9–13.

As to the DTPA, Relators argued, among other things, that the State's claims must be dismissed because TikTok, as a free platform, is not a good or service that is purchase or leased, as required by the Act. Moreover, Relators asserted that the DTPA Claims are barred by Section 230 and the First Amendment.

Despite the trial court's concerns with the State's SCOPE Act Claims and Relators' arguments as to the DTPA Claims, the court denied the motion to dismiss in a one-sentence order.[3] Relators now seek mandamus relief to correct this error.

---

[3] After the State failed to explain (for the second time) "what [Relators] are currently doing that's alleged to be a violation" of the SCOPE Act, the court expressed its view that "it's a fair point for [Defendants] to raise [']what are we alleged to have done wrong?[']" and then suggested the parties "have a conversation . . . instead of litigating this as a violation." MR 0432:13–34:5. Before filing the instant Petition, Relators sent a letter to the State to initiate the dialog suggested by the court.

## ARGUMENT

Mandamus relief is appropriate where "(1) the trial court abused its discretion by denying [Relators'] Rule 91a motion[] to dismiss, and (2) [Relator] has no adequate remedy by appeal." *In re Essex Ins. Co.*, 450 S.W.3d 524, 526 (Tex. 2014).

A "failure by the trial court to analyze or apply the law correctly [] constitute[s] an abuse of discretion." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). This is true even when the "erroneous legal conclusion [is] in an unsettled area of law." *Perry v. Del Rio*, 66 S.W.3d 239, 257 (Tex. 2001). And there is no adequate remedy for appeal when, absent mandamus: (1) the parties and public would waste "time and money spent on fatally flawed proceedings," *In re Essex*, 450 S.W.3d at 526; or (2) a litigant would "suffer 'impairment . . .' of 'important substantive . . . rights,'" including those conferred by statutes that "provide covered defendants with immunity from suit," *In re Facebook, Inc.*, 625 S.W.3d 80, 87 (Tex. 2021) (second alteration in original) (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004)).

The trial court's rulings meet this standard. The court did not "analyze or apply the law correctly" when it (1) refused to dismiss the SCOPE Act Claims for unconstitutional vagueness, despite the State's inability to explain how Relators allegedly violated the Act or what the Act's standards require Relators to do; (2)

13

applied the DTPA, for the first time, to an action seeking to regulate conduct that cannot *even theoretically* affect any statutory "consumer"; (3) refused to apply Section 230's immunity to the DTPA Claims, which target publishing conduct; and (4) refused to recognize that the First Amendment bars the DTPA Claims for targeting plainly expressive activities. Mandamus is necessary to preserve Relators substantive rights and to spare the parties and public from wasting resources on a fatally flawed set of claims.

I. **The trial court abused its discretion in refusing to dismiss the SCOPE Act Claims, despite the State's dispositive concessions.**

The trial court's refusal to dismiss the State's SCOPE Act Claims is a textbook case for mandamus relief. The State conceded it cannot explain what the SCOPE Act requires or how Relators allegedly violated it—underscoring the statute's vagueness as applied. This defect is especially acute given the Act's regulation of protected speech under the First Amendment.

Under well-settled Texas law, a "vague statute offends due process" and is void if it "fails to give fair notice of what conduct may be punished" or "invites arbitrary or discriminatory enforcement." *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). And where a "statute's language is capable of reaching protected speech," courts apply "a stricter vagueness standard." *Id.* at 438. That is "[b]ecause First Amendment freedoms need breathing space to

14

survive." *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). That stricter vagueness standard applies here: as the *SEAT* court explained, the SCOPE Act threatens minors' "'right to receive information and ideas' . . . and 'communicate with one another.'" *SEAT*, 765 F. Supp. 3d at 591–92.

The SCOPE Act's "verification" requirement—and thus also the definition of "verified parent"—fails this standard, requiring dismissal of all three SCOPE Act claims. Section 509.101 of the SCOPE Act requires digital service providers to "verify, using a *commercially reasonable method* and for each person seeking to perform an action on a digital service as a minor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." Tex. Bus. & Com. Code § 509.101(a) (emphasis added). The phrase "commercially reasonable method" is the statute's central liability standard—yet the Act does not define it, identify any acceptable methods, or provide guidance of any kind for providers to follow. *See id.* § 509.101. It therefore both "forc[es] people to guess at the statute's meaning," and "invites arbitrary or discriminatory enforcement." *Benton*, 980 S.W.2d at 437.

Courts have already recognized this problem. In *NetChoice v. Carr*, the Northern District of Georgia held that the identical "commercially reasonable" standard in a similar Georgia statute was unconstitutionally vague, emphasizing that

15

its indeterminate nature enabled the state's "disparate enforcement plan," which was "a central and fatal source of vagueness under the law." 789 F. Supp. 3d 1200, 1211–12, 1231 (N.D. Ga. 2025) (citing O.C.G.A. § 39-6-2(a)), *appeal filed* No. 25-12436 (11th Cir. July 16, 2025). The same defect exists here.

The State's own pleading and admissions confirm the point. In its amended petition, the State acknowledges that TikTok offers the Family Pairing feature, which "allow[s] 'parents or guardians [to] link their TikTok account to their teens' to manage a variety of content, privacy, and well-being settings.'" MR 0073–74. Family Pairing requires parents to request to pair their own account with their minor's and have that request accepted by the minor. MR 0074. The State alleges that this method is not a "commercially reasonable" method of complying with Section 509.101 without identifying what would be reasonable or why TikTok's method is not. MR 0090. Tellingly, the charging paragraphs complain only about unrelated features of Family Pairing, not anything to do with the verification requirements of Section 509.101.[4] Relators are left with no notice of "what conduct may be punished." *Benton*, 980 S.W.2d at 437.

---

[4] Specifically, the State complains that TikTok "unnecessarily requires a parent or guardian to create an account" before being able to access Family Pairing tools, and that "known minor[s] [have] sole discretion to accept or deny their parent or guardian access to the parental tools." MR 0090. The State never explains how either of these features has anything to do with the verification requirements of Section 509.101.

16

The State's concessions at the motion to dismiss hearing remove any doubt. When asked to explain "in what manner [Relators] have fallen short," the State admitted that it would need "both discovery and expert testimony" to answer that question. MR 0430:20–31:9. The court pressed further, asking again "what [Relators] are currently doing that's alleged to be a violation of the Act." MR 0432:13–15. The State again failed to answer, noting instead that it "would have to wait for—essentially for discovery and for us to get that . . . knowledge into evidence because I don't have it in front of me right now." MR 0433:8–9. The State even indicated that "what commercially reasonable means to TikTok" might be a different standard than one that applies to "all different possible providers"— precisely the arbitrary enforcement *Benton* forbids. MR 0421:10–22; *see Carr*, 789 F. Supp. 3d at 1231 (state's argument that "what is commercially reasonable for Facebook . . . might be different than what is commercially reasonable for Dreamwidth" demonstrates a "fatal source of vagueness in the law").

These admissions are dispositive: the State cannot articulate what the Act requires, what "commercially reasonable" means, or how Relators allegedly violated the law. Few cases illustrate vagueness more starkly than this one.

The court recognized that Relators had raised "a fair point" about "what are we alleged to have done wrong," MR 0433:5–34:5, and even suggested that the

17

parties "have a conversation . . . instead of litigating this as a violation." MR 0433:5–34:5. Nonetheless, the court denied Relators' motion. This failure to correctly apply the law is an abuse of discretion. *Walker*, 827 S.W.2d at 840 (A "failure by the trial court to analyze or apply the law correctly [] constitute[s] an abuse of discretion."). That error is especially serious because the court was required to apply a heightened vagueness standard, given that the challenged provisions regulate speech. *Benton*, 980 S.W.2d at 438 (laws "capable of reaching protected speech" demand "a stricter vagueness standard"); *SEAT*, 765 F. Supp. 3d at 591–92 (SCOPE Act threatens minors' "'right to receive information and ideas' . . . and 'communicate with one another'").

The vagueness of the "verification" requirement in Section 509.101 requires dismissal of *all* of the State's SCOPE Act Claims. Because the term "verified parent"—which appears throughout the Act, including in the provisions underlying Counts XII and XIII—is defined by reference to Section 509.101, the term "verified parent" is unconstitutionally vague, as well.[5] The vagueness of Section 509.101's

---

[5] *See* Tex. Bus. & Com. Code Ann. § 509.001(7) ("'Verified parent' means the parent or guardian of a known minor whose identity and relationship to the minor have been verified by a digital service provider under Section 509.101."); *see also* MR 0091 (Count XII) (alleging that TikTok uses minors' information "without obtaining permission from their verified parent" (citing Tex. Bus. & Com. Code § 509.052)); MR 0092 (Count XIII) (alleging that TikTok does not provide "verified parents" the tools required under Section 509.054); Tex. Bus. & Com. Code § 509.054(a) ("A digital service provider shall create and provide to a verified parent parental tools

18

"commercially reasonable" standard thus infects not only Count XI (alleging TikTok does not use a commercially reasonable standard to verify a minor's parent), but also Counts XII (alleging TikTok disclosed minor data without a "*verified parent['s]*" consent) and Counts XIII (alleging TikTok failed to provide proper tools to "*verified parents*").[6] *See* Tex. Bus. & Com. Code §§ 509.001, 509.052, 509.054; MR 0091–92. Relators are thus left with no option but to guess at who counts as a "verified parent," and then to again guess at how to get the necessary approvals from and provide the required tools to those parents.

## II.    The trial court abused its discretion by expanding the scope of the DTPA.

The trial court did not merely misinterpret the DTPA; it created a sweeping, unprecedented expansion of the statute by regulating alleged conduct that does not—and cannot—affect any "consumer." By extending the Act beyond its text and purpose, the court transformed a consumer-protection statute into a generalized prohibition on alleged deception, a role the Legislature never authorized. This interpretation is not supported by any precedent and contradicts the statute's

---

to allow the verified parent to supervise the verified parent's known minor's use of a digital service.").

[6] Relators maintain, as they argued in their Rule 91a motion, that Sections 509.052 and 509.054 are also independently vague. However, Relators limit this mandamus petition to the threshold "commercially reasonable" standard.

express purpose to protect "consumers" seeking to "purchase or lease" "goods or services." *See Burton v. Prince*, 577 S.W.3d 280, 291 (Tex. App.—Houston [14th Dist.] 2019, no pet.); Tex. Bus. & Com. Code § 17.44 ("underlying purpose[]" of DTPA is to "protect consumers"); *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 787 F. Supp. 689, 697 (W.D. Tex. 1992) (state must establish there are "'consumers' within the statutory definition whose rights will be protected"), *rev'd on other grounds*, 986 F.2d 962 (5th Cir. 1993).

The DTPA defines "consumer" as one "who seeks or acquires by *purchase or lease*, any *goods or services*." Tex. Bus. & Com. Code § 17.45(4) (emphasis added). Here, the State cannot show any "goods," "services," "purchase," or "lease."

**No "goods."** Both parties agree that TikTok is not a "good," which the DTPA defines as "tangible chattels or real property purchased or leased for use." *Id*. § 17.45(1); *compare* MR 0119–20, *with* MR 0269–79.

**No "services."** TikTok is also not a "service" under the DTPA, defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex. Bus. & Com. Code § 17.45(2). The Texas Supreme Court has held that "services" under the DTPA must involve "activity on behalf of one party by another"—"similar in nature to work or labor." *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980). TikTok is not

20

"conduct or performance that assists or benefits someone," *Woods v. Littleton*, 554 S.W.2d 662, 667 (Tex. 1977) (citations omitted); it is a platform, not an activity performed for a user. Without a "good" or "service," there is no "consumer." Tex. Bus. & Com. Code § 17.45(4).

**No "purchase" or "lease."** Even if TikTok were "similar in nature to work or labor" (i.e., a "service"), it is not "purchased or leased." *See* Tex. Bus. & Com. Code § 17.45(2). Users download and use TikTok for free.[7] The State's theory—that exchanging data for access to the platform constitutes a "purchase"—is unsupported by the statute and contradicts common usage.[8] If that interpretation were correct, every free online interaction—running a Bing search, checking scores on ESPN.com, or getting directions on Google Maps—would qualify as a "purchase." The State effectively conceded this absurdity at the hearing. MR 0393:9–23.

---

[7] *See* Purchase, *Black's Law Dictionary* (12th ed. 2024) ("The act or an instance of buying"); Purchase, *Cambridge Dictionary* ("to buy something"); Lease, *Black's Law Dictionary* (12th ed. 2024) ("To grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration"); Lease, *Cambridge Dictionary* ("to make a legal agreement by which money is paid in order to use land, a building, a vehicle, or a piece of equipment for an agreed period of time").

[8] That position not only conflicts with the State's petition, but it also badly mischaracterizes what happens when a user downloads and uses the TikTok app for free. Users do not provide data in "exchange" for downloading the app. The Petition itself recognizes that data is not given in exchange for a download but is rather part-and-parcel of the experience that the user is receiving for free: "Defendants process the data collected from and about TikTok users to provide a never-ending stream of videos personalized for them by TikTok's algorithm." MR 0034.

Confronted with clear statutory definitions and binding precedent, the State advanced an extraordinary theory: that it may bring a DTPA claim based on conduct that does not—and cannot even in theory—involve any "goods," "services," or "consumers." That position is wrong, and it was an abuse of discretion for the court to extend the DTPA in this limitless manner.

*First,* the DTPA's "Construction and Application" provision mandates that the Act be "applied to promote its underlying purposes, which are to *protect consumers* against false, misleading, and deceptive business practices." Tex. Bus. & Com. Code Ann. § 17.44 (emphasis added). The statute identifies no class other than "consumers" for protection and expressly assigns enforcement authority to the Attorney General's "*consumer* protection division." *Id.* §§ 17.46(a) (emphasis added), 17.45(8). By attempting to regulate conduct that cannot *even theoretically* affect any "consumer," as defined in the statute, the State seeks to rewrite the statute and expand its scope to a place it has never gone. The DTPA cannot be "[c]onstruct[ed] and [a]ppli[ed]" in that manner. *Id.* § 17.44.

*Second*, the only court to address whether the State may bring a DTPA claim in the absence of any "consumer" held that it cannot. *See Word of Faith*, 787 F. Supp. at 698. That court concluded that "there must be some 'consumer,' either the plaintiff, or if the Attorney General is bringing the action, 'consumers,' within

22

the statutory definition whose rights will be protected." *Id.* at 697. Because church donors did not "seek to purchase goods or services" in exchange for their donation, they were "not 'consumers,'" and the Attorney General could not sue on their behalf. *Id.* at 698. The same is true here: TikTok users do not purchase goods or services when downloading and using the free platform.

*Third*, the State's own pleadings and testimony at the hearing contradict its theory. The Petition references "consumer[s]" 66 times and bases each DTPA claim (Counts I–X) on statutory provisions requiring misrepresentations about "goods or services." *See* Tex. Bus. & Com. Code §§ 17.46(b)(5), (7), (9), and (24); MR 0075–90. At the hearing, the State described the TikTok users whom it was allegedly protecting as "consumers" at least nine times.[9] Yet the State now insists the Act applies even when no consumer, good, or service exists—a position irreconcilable with its own allegations.

*Finally*, the State's reliance on three cases it raised at the 91a hearing is misplaced. *See* MR 0400:19–402:6. Those decisions merely hold that the Attorney General need not prove injury and need not be a consumer; they do not authorize enforcement where no consumer exists. In each case, the State acted to protect

---

[9] *See, e.g.*, MR 0382:3–6; MR 0383:10–14; MR 0383:24–0384:2, MR 0385:1–12; MR 0389:15–16; MR 0391:24–25; MR 0392:2–9; MR 0393:17–19.

23

consumers of goods or services: *Colony Ridge, Inc.* involved misrepresentations inducing land purchases;[10] *Holzman* concerned privacy violations affecting patients of a physician;[11] and *Household Retail Servs., Inc.* addressed deceptive practices harming HVAC purchasers.[12] Here, by contrast, there are no consumers, goods, or services at all. Extending the DTPA to this context would be a radical and unauthorized expansion of the statute.

* * *

In sum, the State cannot satisfy the statutory definitions of "goods" or "services," nor demonstrate any "purchase" or "lease." As a result, there are no "consumers" affected by Relators' alleged conduct. Tex. Bus. & Com. Code § 17.45(4). Applying the DTPA to circumstances without even the possibility of any "consumers" would transform a consumer-protection statute into a generalized prohibition on alleged deception. Concerned with that possibility, the court asked the State about the "consequence[s] of the interpretation [it was] advancing[.]" MR 0393:6–12. Though the State doubled down on its expansive interpretation,

---

[10] *Texas v. Colony Ridge, Inc.*, 2024 WL 4553111, at *1–2 (S.D. Tex. Oct. 11, 2024).

[11] *Holzman v. State*, 2013 WL 398935, at *1 (Tex. App.—Corpus Christi-Edinburg Jan. 31, 2013, pet denied).

[12] *Household Retail Servs., Inc. v. State*, 2001 WL 984779, at *4 (Tex. App.—San Antonio Aug. 29, 2001, no pet.).

MR 0393:9–23, the court nonetheless adopted it without any reasoning to address its own concern.

Because these claims are "barred by an established legal rule," *In re First Rsrv. Mgmt. L.P.*, 671 S.W.3d 653, 661 (Tex. 2023), and courts have "rejected the viability of [similar] action under the circumstances pleaded by the plaintiff," *In re Geico Cnty. Mut. Ins. Co.*, 2022 WL 17843869, at *2 (Tex. App.—Dallas Dec. 22, 2022, no pet.) (quoting *Reaves v. City of Corpus Christi*, 518 S.W.3d 594, 608 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.)), the trial court was required to dismiss the DTPA Claims under Rule 91a. Its failure to do so was an abuse of discretion.

## III. The trial court abused its discretion by denying Relators immunity under Section 230.

Section 230 of the Communications Decency Act ("Section 230") bars the State's DTPA Claims (in Counts I–X) because they seek to impose liability on Relators for publishing and moderating user-generated content. The trial court's refusal to apply Section 230 was an abuse of discretion.

### A. Section 230 provides broad immunity for publishing decisions.

Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts have repeatedly held

25

that this provision confers "broad immunity" on online providers for "all claims stemming from their publication of information created by third parties," including at the motion to dismiss stage. *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (emphasis omitted) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

Publishing activity includes "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online," *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc), such as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *accord Salesforce*, 123 F.4th at 795 (Section 230 bars claims that would create a "duty [that] would necessarily require an internet company to monitor, alter, or remove third-party content.") (cleaned up).

TikTok Inc. indisputably qualifies as a "provider" of "an interactive computer service." *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).[13] Nor is there any question that the videos the State complains about are not "[TikTok's] own content [but], rather, third-party material published on

---

[13] Relators' arguments in this Section focus on TTI because TTI is the publisher of TikTok in the United States. If TTI is immune from the State's claims under Section 230, so are the remaining Relators.

26

[TikTok]." *See Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 699 (N.D. Ill. 2025). Section 230 therefore mandates dismissal of claims that seek to hold TTI liable "for deciding whether" and "how" to "publish, withdraw, postpone or alter content provided by third parties," *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525–26 (4th Cir. 2025) (cleaned up), including each of the State's DTPA claims.

### B. Section 230 bars Count IX.

In Count IX, the State seeks to hold Relators liable for failing to disclose that design features allegedly "contribute[] to compulsive or excessive use that harms users." MR 0087. Courts have held that Section 230 immunity extends both to "failure to warn" claims and to platform design and algorithmic tools because these are "part and parcel of [a platform's] overall design and operation,'" and involve "'choices about what content can appear on the [platform] and in what form' and thus 'fall within the purview of traditional publisher functions.'" *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Doe v. Backpage.com, LLC*, 817 F.3d 12, 20–21 (1st Cir. 2016)); *see also Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (the "ordinary meaning" of "publisher" encompasses an online platform's use of "tools such as algorithms that are designed to match [third-party] information with a consumer's interests"); *M.P.,* 127 F.4th at 526 ("Decisions

27

about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task.").

Section 230 thus bars Count IX as to each of the features it challenges: TikTok's algorithm-based "stream of content . . . that is acutely personalized", MR 0061–62;[14] interactive features such as "comments," "direct messages," and "group chats," MR 0056–58;[15] TikTok's "infinite scroll," "autoscroll," and

---

[14] "[A]lgorithms that predict and show . . . third-party content that is most likely to interest and engage users" are "an essential part of traditional publishing." *Force*, 934 F.3d at 65, 70–71 (emphasis in original omitted); *M.P.*, 127 F.4th at 526 ("[T]he fact that Facebook uses an algorithm to achieve . . . engagement does not change the underlying nature of the act that it is performing."); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 832–33 (N.D. Cal. 2023) (algorithm-based recommendation systems are the very "means through which defendants publish third-party content to users," by determining "whether, when, and to whom" to publish such content); *State ex rel. Rosenblum v. TikTok Inc.*, 2025 Ore. Cir. LEXIS 5135, at *36 (Or. Cir. Ct. June 13, 2025) (TikTok's "'algorithms,' 'autoplay,' 'infinite scroll,' and incessant notifications are all content amplification features meant to publish content in a manner that increases user engagement" and protected publishing activity under Section 230).

[15] *Doe v. Grindr*, 128 F.4th 1148, 1153 (9th Cir. 2025) (interactive features, which "'facilitate the communication and content of others' and are 'content neutral' on their own," are subject to Section 230 immunity (quoting *Dyroff*, 934 F.3d at 1098, 1100)); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 882 (N.D. Cal. 2024) ("*MDL II*").

28

"autoplay" features, MR 0060–62;[16] ephemeral content, MR 0061;[17] notifications, MR 0064–65; MR 0042;[18] and filters and effects, MR 0058.[19]

Styling these allegations as a "failure to warn" claim does not change the analysis. *See* MR 0088. Courts around the country—including the Supreme Court of Texas—have rejected attempts to evade Section 230 by repackaging publishing decisions in this way.[20] A contrary rule would eviscerate Section 230's protections. *See Wozniak v. YouTube, LLC*, 319 Cal. Rptr. 3d 597, 615 (Cal. Ct. App. 2024), *as modified on denial of reh'g* (Apr. 2, 2024) ("allow[ing] essentially every state cause of

---

[16] *State ex rel. Rosenblum*, 2025 Ore. Cir. LEXIS 5135, at *36 (holding TikTok's "autoplay" and "infinite scroll" are "content amplification measures" protected by Section 230); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831 (N.D. Cal. 2023) ("*MDL I*") (making such features the basis of liability would force platforms "to publish less third-party content").

[17] *MDL II*, 753 F. Supp. 3d at 881 (quoting *MDL I*, 702 F. Supp. 3d at 832) (Section 230 immunizes platforms' choices as to "the length of content published and how long to publish" such content as "traditional editorial functions.").

[18] *Id.* (quoting *MDL I*, 702 F. Supp. 3d at 833) ("[W]here notifications . . . alert users to third-party content [on a platform], Section 230 bars" liability based on the notifications.).

[19] *See Dyroff*, 934 F.3d at 1096 (Section 230 protects "content-neutral tools" that are "meant to facilitate the communication and content of others.").

[20] *See, e.g.*, *In re Facebook, Inc.*, 625 S.W.3d at 95–96 & n.11 (holding Section 230 barred claims "premised on Facebook's alleged failures to warn or to adequately protect Plaintiffs from harm caused by other users") (collecting cases); *Grindr*, 128 F.4th at 1154 ("Nor can Grindr be held liable for failure to warn. . . . Grindr's role as a publisher of third-party content does not give it a duty to warn users of a general possibility of harm resulting from the App." (internal quotations omitted)); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) ("Herrick's failure to warn claim is inextricably linked to Grindr's alleged failure to edit, monitor, or remove the offensive content provided by his ex-boyfriend; accordingly, it is barred by § 230.").

action otherwise immunized by section 230 to be pleaded as a failure to warn" claim "runs counter" to settled authority).

### C. Section 230 bars Counts I-VIII and X.

Counts I–VIII and X seek to hold Relators liable for the allegedly high volume of user-generated content on the platform that is inappropriate for teens (Counts I–VIII) and TTI's alleged failure to enforce its own Guidelines (Count X). These claims directly target editorial decisions—conduct Section 230 squarely protects.[21]

Courts have consistently held that claims based on a platform's alleged failure to follow its own content moderation policies are barred by Section 230. For example, in *Doe v. Grindr*, 128 F.4th 1148, 1154 (9th Cir. 2025), the court held that Section 230 bars negligent misrepresentation claims based on a platform's "description of its moderation policy."[22] Similarly, in *Winter v. Facebook, Inc.*, the court held that Section 230 barred a claim that TTI "refused to remove" content, including by "failing to follow their own Community Standards and tak[e] down

---

[21] "[W]hat matters is not the name of the cause of action," *Barnes*, 570 F.3d at 1101, but instead "whether the claims 'inherently require[] the court to treat the defendant as the publisher or speaker of content provided by another,'" *Dyroff*, 934 F.3d at 1098 (alteration in original) (quoting *Barnes*, 570 F.3d at 1102).

[22] *Accord Beckman v. Match.com, LLC*, 668 F. App'x 759, 759 (9th Cir. 2016) (rejecting misrepresentation claims based on platform's alleged non-compliance with own safety policies because the "basis for each of those claims is [the service's] role as a publisher of third-party information"); *Doe v. MySpace*, 528 F.3d at 419–22 (rejecting negligent misrepresentation claims based on similar alleged failures to limit content and interactions).

content that violates those standards." 2021 WL 5446733, at *4–5 (E.D. Mo. Nov. 22, 2021). In short, platforms cannot be held liable for describing the general standards that govern the third-party content they publish or for the manner in which they enforce those standards. *See, e.g.*, *State ex rel. Rosenblum v. TikTok Inc.*, 2025 Ore. Cir. LEXIS 5135, at *40 (Or. Cir. Ct. June 13, 2025) (dismissing claims based on TTI's alleged failure to moderate content or enforce its Guidelines and noting only "*specific* misrepresentations about *particular* safety products or features" may be actionable (emphasis added)); *see also id.* at *32–34 (collecting cases in accord). For good reason: "holding [an online provider] liable for establishing standards and guidelines would ultimately create a powerful disincentive for service providers to establish any standards or ever decide to remove objectionable content, which the CDA was enacted to prevent." *Bennett v. Google*, *Inc.*, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017), *aff'd sub nom. Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018). But that is precisely what the State seeks to do here.

The State's theory—that TikTok's Age Ratings and Guidelines are deceptive because "TikTok's filters and moderators often fail to catch [mature content]," MR 0039—cannot be disentangled from the platform's publishing decisions. *See also, e.g.*, MR 0041, MR0045–46, MR 0049, MR 0069 (alleging statements are deceptive due to high "leakage" rates for content categories). Courts have

repeatedly held that such claims are barred by Section 230 because they are premised on "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates.com*, 521 F.3d at 1170–71.[23] Indeed, even when a provider "adopts definitive prohibitions regarding the content of third-party user material, and does not enforce them," Section 230 immunity applies. *Bennett*, 2017 WL 2692607, at *2.

Given the overwhelming authority applying Section 230 to bar claims targeting publishing and moderation conduct, the trial court's refusal to dismiss Counts I–X reflects a clear failure to apply controlling law—and thus an abuse of discretion. *See Walker*, 827 S.W.2d at 840.

## IV. The trial court abused its discretion by failing to dismiss the DTPA claims under the First Amendment.

Beyond Section 230's immunity, the First Amendment to the U.S. Constitution independently protects an online platform's editorial discretion over how it selects, organizes, and presents third-party, user-generated content. The

---

[23] *See also Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010) (Under Section 230, claims "seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997))); *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1030 (N.D. Cal. 2021) ("[T]he text of § 230(c) immunizes the 'blocking and screening of offensive material,' . . . also known as 'content moderation.'"); *MDL I*, 702 F. Supp. 3d at 853 n.58 (noting that "plaintiffs are barred from holding defendants' [sic] liable for their content moderation activities" and that their claims "must . . . not take issue with defendants' choices as to what content to take down or censor").

State's DTPA Claims (Counts I–X) violate this protection in two ways: first, by seeking to impose liability for constitutionally-protected expressive activity; and second, by compelling Relators to convey the State's preferred message about platform content. The U.S. Supreme Court has squarely held such claims unconstitutional. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). The trial court's refusal to apply that binding precedent constitutes an abuse of discretion. *Walker*, 827 S.W.2d at 840.

### A. The DTPA Claims target expressive activity.

In *Moody*, the U.S. Supreme Court confirmed that an online platform's choices about "what third-party speech to display and how to display it"—including "prioritization of content," "use of algorithms," "content moderation," and the platform's "labels," "warning[s], disclaimers, or general commentary"—are expressive activities entitled to full First Amendment protection. 603 U.S. at 716–17, 730–35, 739 (alteration in original). That protection applies fully even where, as here, a state assertedly seeks to protect minors from allegedly harmful speech. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (The First Amendment "does not include a free-floating power to restrict the ideas to which [minors] may be exposed," and "only in relatively narrow and well-defined circumstances may

33

government bar public dissemination of protected materials to them." (citation omitted)).

The State's claims directly challenge these editorial choices. Counts I–VIII seek to enjoin and impose liability for how different types of content allegedly appear on TikTok. MR 0076, MR 0077, MR 0079–82, MR 0084, MR 0086, MR 0092. Count X similarly targets and seeks to enjoin alleged content-moderation practices—specifically, enforcement of the Guidelines. MR 0089, MR 0092. And Count IX expressly targets and seeks to enjoin alleged design features that dictate "what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716; *see* MR 0087–88. Courts consistently dismiss such claims under the First Amendment.[24] *See O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1188 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024).

The State's requested relief lays bare its unconstitutional objective: it asks the court to enjoin TTI from making its current "representations in the Community

---

[24] *E.g.*, *Patterson v. Meta Platforms, Inc.*, 2025 WL 2092260, at *5 (N.Y. App. Div. July 25, 2025) ("[S]ocial media defendants are entitled to First Amendment protection for third-party content recommended [] by algorithms."); *Angelilli*, 781 F. Supp. 3d at 701 ("[I]nteractive features [that] make [content] engaging and effective" implicate "First Amendment protection . . . at its zenith."); *State ex rel. Rosenblum v. TikTok Inc.*, 2025 Ore. Cir. LEXIS 5153, at *50 (Or. Cir. Ct. June 13, 2025) (refusing to impose liability based on TikTok's design, because doing so would interfere with "editorial decisions regarding how it disseminates information").

Guidelines about the content permitted on TikTok," MR 0093, such as statements about what content is "not allowed," MR 0068, and the statement that the Guidelines "establish a set of norms and common code of conduct that provide for a safe and welcoming space for everyone," MR 0067–68.[25]  But the First Amendment forbids government efforts to "regulat[e] the content-moderation policies" that an online platform "use[s] for [its] feed[]" in an attempt to "change the speech that will be displayed there." *Moody*, 603 U.S. at 743.  It bars any "interfere[nce]" with a platform's "editorial choices" regarding what content-moderation policies to adopt, and any attempt to "alter[] the content of [its] compilation" by compelling inclusion of excluded material—or exclusion of included material. *Id.* at 731–32.  The State's theory thus strikes at the heart of protected editorial discretion, seeking precisely the kind of government control over speech that the First Amendment forbids.

### B. The DTPA claims seek to compel speech.

The injunction the State seeks would force Relators to adopt the State's preferred disclosures about TikTok's content and alleged risks.  Counts VIII, IX,

---

[25] While the First Amendment does not protect fraudulent speech, these "statements of policy" at issue here are too "general" to be verifiably false. *See Bogard v. TikTok Inc.*, 2025 WL 604972, at *11 (N.D. Cal. Feb. 24, 2025) (addressing "don't allow" statements in TikTok's Community Guidelines and noting "it is difficult to imagine how such statements of policy could be considered 'false'").

and X assert that Relators "failed to disclose" that the platform contains "Explicit Adult Content," is "addictive," and "deliberately permit[s]" "mature content." MR 0086, MR 0088–89. And the Prayer for Relief demands that Relators disclose these messages in the Guidelines. MR 0093. The State thus seeks a court order telling Relators how to label and communicate about the content on the platform.

Compelling platforms to label content or adopt government-scripted warnings violates the First Amendment. *Moody* recognized that a platform's "labels," "warning[s], disclaimers, or general commentary" are part of its expressive message. 603 U.S. at 735, 739. These disclosures are not mere commercial speech, which "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotations omitted); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119–20 (9th Cir. 2024) (rejecting argument that speech about platform was commercial); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) (noting that "a speaker's rights are not lost merely because compensation is received"). Instead, the State's requested relief seeks to compel Relators to tailor how they label and speak about the types of content available on TikTok to reflect the State's perspective—that is, to carry the State's preferred message about TikTok.

36

The First Amendment does not tolerate these types of efforts to force private entities to communicate the government's message. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (laws that compel speech with a particular message about controversial issues violate the First Amendment); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180–81, 188–91 (2024) (reaffirming that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors"). The Ninth Circuit's recent decision in *Bonta* underscores this point: it struck down a law requiring platforms to create reports about "harm" to children and mitigation plans, holding that compelled disclosure of "highly subjective opinions about content-related harms" violates the First Amendment. 113 F.4th at 1116–17, 1122.[26] So, too, here: The State not only seeks to impose liability on Relators for not communicating the State's preferred message that TikTok contains "Explicit Adult Content" and is

---

[26] While in some circumstances, the Constitution permits the State to require speakers to convey certain messages without their consent, those are typically limited to the inclusion of "purely factual and uncontroversial information" and those requirements must be "reasonably related to the State's interest in preventing deception of consumers." *See Zauderer v. Off. of Disciplinary Couns. for Sup. Ct. of Ohio*, 471 U.S. 626, 651–52 (1985); *see also Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006). What the State contends TTI must say but has not—for example, the subjective determinations that "Mature/Suggestive Themes" are "Frequent/Intense" rather than "Infrequent/Mild" or that the platform's age rating is "17+" rather than "12+," *see* MR 0078, MR 0084—is neither purely factual, nor uncontroversial.

allegedly addictive, *see* MR 0086, MR0088, but it also asks the court to dictate Relators' own speech about these topics, MR 0093.

The First Amendment therefore bars each of the State's DTPA Claims.[27] The court abused its discretion in ruling otherwise.[28]

---

[27] Courts do not typically apply the tiers of scrutiny where, as here, the State seeks to impose tort-like liability in violation of the First Amendment; if the First Amendment has been properly raised in defense, they simply dismiss the claims. *See Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011); *James v. Meow Media, Inc.*, 300 F.3d 683, 696–97 (6th Cir. 2002); *Angelilli*, 781 F. Supp. 3d at 700–03. If any level of scrutiny applies, the State's claims would be subject to strict scrutiny because they are content based: the State seeks to enjoin and impose liability for how specific types of content allegedly appear on TikTok, and alleges TikTok is addictive because of the way it curates and displays certain content to its users, and because the subject matter of that content is supposedly too engaging. *See, e.g.*, MR 0060–66, MR 0087–88. And the State's claims cannot survive strict scrutiny: while protecting minors is an important state interest, it does not give the State "free-floating power to restrict the ideas to which [minors] may be exposed." *Brown*, 564 U.S. at 794. The State's use of civil litigation—including penalties and coercive injunctions—is not tailored to serve that interest. There are less restrictive ways to protect minors, such as public education campaigns to inform users and parents about its views on platform safety. *E.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1127 (D. Utah 2024).

[28] The Nevada Supreme Court's recent decision denying a writ petition filed by TikTok Inc. and others—including on Section 230 and First Amendment grounds—is not persuasive, as it is both distinguishable and wrongly decided. *See TikTok, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 141 Nev. Adv. Op. 51, 2025 WL 3111587 (Nev. Nov. 6, 2025). For its Section 230 ruling, *Nevada* relied on *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), *see TikTok Inc.*, 2025 WL 3111587 at *6–*7, which rejected Section 230 immunity because the claims targeted Snap's own design features—not any third-party content—that caused harm "fully independent" of publishing activity, *Lemmon*, 995 F.3d at 1093. Texas's claims, by contrast, challenge algorithmic amplification of allegedly harmful third-party content, *see* MR 0052, MR 0056–58, implicating both Section 230's protections for publishing activity and the First Amendment's independent protections for editorial discretion—a challenge that the State of Nevada expressly disclaimed, *TikTok Inc.*, 2025 WL 3111587 at *7–*8. *Nevada*'s reasoning, grounded entirely in *Lemmon*, is therefore inapposite. (*Nevada* was also wrong to rely on *Lemmon*: in Nevada, the alleged harms arising from the design elements at issue were not independent of the third-party content that those elements caused to be published.)

The First Amendment analysis is likewise irrelevant. *Nevada* found the State's claims fell outside *Moody*'s scope because they involved algorithms that allegedly respond "solely" to user

**V. An appeal is not an adequate remedy to correct the trial court's abuses of discretion.**

Whether "an adequate appellate remedy exists" is determined "by weighing the benefits of mandamus review against the detriments." *In re Acad., Ltd.*, 625 S.W.3d 19, 32 (Tex. 2021). "Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Prudential*, 148 S.W.3d at 136. Under this standard, there is no adequate remedy here for at least two independent reasons.

*First*, where, as here, a proceeding is "fatally flawed," mandamus relief is appropriate to "spare the parties and the public" from wasting "time and money."

---

behavior. *TikTok Inc.*, 2025 WL 3111587 at *8 (quoting 603 U.S. at 736 n.5). By contrast, Texas alleges TikTok's algorithm incorporates company-driven inputs and editorial standards, making it expressive under *Moody*. *See* MR 0038–39, MR 0040–41, MR 0044–0046, MR 0062. (*Nevada*'s First Amendment analysis was also wrong: the State of Nevada's theory is that TikTok's algorithm and other features are addictive to users because of the overall mix of videos displayed and the way in which they are displayed. That theory not only challenges algorithms deemed expressive in *Moody*, but it is also a content-based claim subject to strict scrutiny.) Finally, *Nevada*'s reliance on *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) to treat TikTok's statements as commercial speech, *see TikTok Inc.*, 2025 WL 3111587 at *8, does not apply. The statements Texas challenges concern content moderation policies—not economic interests—and thus remain fully protected.

39

*In re Essex*, 450 S.W.3d at 528. Relators should not be required to engage in time-intensive and expensive discovery, trial, and appeal processes before obtaining an appellate ruling that the State's SCOPE Act and DTPA Claims have no basis in law or fact. *See id.*; *see also In re Prudential*, 148 S.W.3d at 136; *In re John G. & Marie Stella Kenedy Mem'l Found.*, 315 S.W.3d 519, 523 (Tex. 2010) ("[M]andamus relief is appropriate" to spare parties time and money wasted on proceedings that will eventually be reversed.). By contrast, the burden of mandamus review here is minimal: Rule 91a dismissal turns exclusively on the plaintiff's pleadings; no depositions, discovery responses, or other evidence can be considered. *See* Tex. R. Civ. P. 91a.6. And neither the government nor the public has any "legitimate interest in enforc[ing] [] an unconstitutional law." *Carr*, 789 F. Supp. 3d at 1233.

*Second*, mandamus relief is especially critical in this case to prevent the "impairment or loss" of Relators' "important substantive and procedural rights." *In re Prudential*, 148 S.W.3d at 136. The Texas Supreme Court has already held that the immunity from suit conferred by Section 230 is among the "important substantive . . . rights" that can "only be vindicated by dismissal" and mandamus, rather than appeal. *In re Facebook*, 625 S.W.3d at 86–87. In fact, "[t]he most frequent use we have made of mandamus relief involves cases in which the very act of proceeding to trial—regardless of the outcome—would defeat the substantive right

40

involved." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008). And the vague SCOPE Act provisions at issue infringe on Relators' rights under the Due Process Clause and First Amendment. These rights demand clear notice at the outset and are infringed on an ongoing basis while the State litigates claims against Relators when it cannot articulate what they have done wrong or how they could have complied with the Act. *See Benton*, 980 S.W.2d at 437.

## CONCLUSION AND PRAYER

For the reasons set forth above, this Court should grant mandamus and reverse the trial court's denial of Relators' Rule 91a Motion to Dismiss the State's amended petition. This Court should further enter an order vacating the trial court's decision and instructing the trial court to enter an order dismissing the State's amended petition in its entirety.

November 18, 2025                           Respectfully submitted,


                                            /s/ Brandon Duke


Neema T. Sahni (*pro hac vice*)             Brandon Duke
nsahni@cov.com                              bduke@omm.com
**COVINGTON & BURLING LLP**                 **O'MELVENY & MYERS LLP**
1999 Avenue of the Stars                    700 Louisiana St., Suite 2900
Los Angeles, CA 90067                       Houston, TX 77002
Tel. (424) 332-4800                         Tel.  (832) 254-1500
Fax. (424) 332-4749                         Fax. (832) 254-1501


Megan A. Crowley (*pro hac vice*)
mcrowley@cov.com
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, DC 20001
Tel. (202) 662-6000
Fax. (202) 778-5112

**ATTORNEYS FOR RELATORS**

## CERTIFICATE OF COMPLIANCE

I certify that this Petition for Writ of Mandamus contains 10,333 words as calculated under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Brandon Duke

Brandon Duke
bduke@omm.com
**O'MELVENY & MYERS LLP**
700 Louisiana St., Suite 2900
Houston, TX 77002
Tel.  (832) 254-1500
Fax. (832) 254-1501

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the this document was electronically

filed and served on all counsel of record on November 18, 2025.

/s/ Brandon Duke

Brandon Duke
bduke@omm.com
**O'MELVENY & MYERS LLP**
700 Louisiana St., Suite 2900
Houston, TX 77002
Tel.  (832) 254-1500
Fax. (832) 254-1501

## APPENDIX

Tab 1:        Order Denying Defendants' Rule 91a Motion (MR 0465)

Tab 2:        Tex. R. Civ. P. 91a

Tab 3:        Communications Decency Act, 47 U.S.C. § 230

Tab 4:        Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.44–.46

Tab 5:        Securing Children Online through Parental Empowerment Act, Tex. Bus & Com. Code §§ 509.001, 509.051–.057, 509.101

Tab 6:        U.S. Const. amend. I

Tab 7:        U.S. Const. amend. XIV

# Appendix – Tab 1

CAUSE NO. D-1-GN-25-003118

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| TIKTOK INC.; TIKTOK LTD.; TIKTOK PTE. LTD.; TIKTOK U.S. DATA SECURITY INC.; BYTEDANCE LTD.; and BYTEDANCE INC., | ) | 250th JUDICIAL DISTRICT |
| *Defendants.* | ) | |

## ORDER DENYING DEFENDANTS' RULE 91A MOTION TO DISMISS

Defendants' Rule 91a motion to dismiss is DENIED.

Signed October 1, 2025.

_____

HON. CORY LIU
JUDGE, 250TH JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS

0466

# Appendix – Tab 2

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 4. Pleading
        C. Pleadings of Defendant
          Rule 91A. Dismissal of Baseless Causes of Action

TX Rules of Civil Procedure, Rule 91a.1
Formerly cited as TX R RCP Rule 91a

91a.1. Motion and Grounds

Currentness

Except in a case brought under the Family Code or a case governed by Chapter 14 of the Texas Civil Practice and Remedies Code, a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact. A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought. A cause of action has no basis in fact if no reasonable person could believe the facts pleaded.

**Credits**
Adopted by order of Feb. 12, 2013, eff. March 1, 2013.

Vernon's Ann. Texas Rules Civ. Proc., Rule 91a.1, TX R RCP Rule 91a.1
Current with amendments received through September 15, 2025. Some rules may be more current, see credits for details.

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix – Tab 3

United States Code Annotated
   Title 47. Telecommunications (Refs & Annos)
     Chapter 5. Wire or Radio Communication (Refs & Annos)
       Subchapter II. Common Carriers (Refs & Annos)
         Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Currentness

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). [1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit--

**(A)** any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

### (3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

### (4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

### CREDIT(S)

(June 19, 1934, c. 652, Title II, § 230, as added Pub.L. 104-104, Title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub.L. 105-277, Div. C, Title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681-739; Pub.L. 115-164, § 4(a), Apr. 11, 2018, 132 Stat. 1254.)

### Footnotes

1        So in original. Probably should be "subparagraph (A)".

47 U.S.C.A. § 230, 47 USCA § 230
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix – Tab 4

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 2. Competition and Trade Practices
      Chapter 17. Deceptive Trade Practices (Refs & Annos)
        Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

V.T.C.A., Bus. & C. § 17.44

§ 17.44. Construction and Application

Currentness

(a) This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

(b) Chapter 27, Property Code, prevails over this subchapter to the extent of any conflict.

**Credits**
Added by Acts 1973, 63rd Leg., p. 322, ch. 143, § 1, eff. May 21, 1973. Amended by Acts 1995, 74th Leg., ch. 414, § 1, eff. Sept. 1, 1995.

V. T. C. A., Bus. & C. § 17.44, TX BUS & COM § 17.44
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 2. Competition and Trade Practices
            Chapter 17. Deceptive Trade Practices (Refs & Annos)
                Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

V.T.C.A., Bus. & C. § 17.45

§ 17.45. Definitions

Currentness

As used in this subchapter:

(1) "Goods" means tangible chattels or real property purchased or leased for use.

(2) "Services" means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods.

(3) "Person" means an individual, partnership, corporation, association, or other group, however organized.

(4) "Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.

(5) "Unconscionable action or course of action" means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

(6) "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

(7) "Documentary material" includes the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording, wherever situated.

(8) "Consumer protection division" means the consumer protection division of the attorney general's office.

(9) "Knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(10) "Business consumer" means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use. The term does not include this state or a subdivision or agency of this state.

(11) "Economic damages" means compensatory damages for pecuniary loss, including costs of repair and replacement. The term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.

(12) "Residence" means a building:

(A) that is a single-family house, duplex, triplex, or quadruplex or a unit in a multiunit residential structure in which title to the individual units is transferred to the owners under a condominium or cooperative system; and

(B) that is occupied or to be occupied as the consumer's residence.

(13) "Intentionally" means actual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure constituting a breach of warranty giving rise to the consumer's claim, coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Intention may be inferred from objective manifestations that indicate that the person acted intentionally or from facts showing that a defendant acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally.

(14) "Vehicle protection product":

(A) means a product or system, including a written warranty:

(i) that is:

(a) installed on or applied to a vehicle; and

(b) designed to prevent loss of or damage to a vehicle from a specific cause; and

(ii) under which, after installation or application of the product or system described by Subparagraph (i), if loss or damage results from the failure of the product or system to perform as represented in the warranty, the warrantor, to the extent agreed on as part of the warranty, is required to pay expenses to the person in this state who purchases or otherwise possesses the product or system for the loss of or damage to the vehicle; and

(B) may also include identity recovery, as defined by Section 1304.003, Occupations Code, if the product or system described by Paragraph (A) is financed under Chapter 348 or 353, Finance Code.

(15) "Warrantor" means a person named under the terms of a vehicle protection product warranty as the contractual obligor to a person in this state who purchases or otherwise possesses a vehicle protection product.

(16) "Loss of or damage to the vehicle," for purposes of Subdivision (14)(A)(ii), may also include unreimbursed incidental expenses that may be incurred by the warrantor, including expenses for a replacement vehicle, temporary vehicle rental expenses, and registration expenses for replacement vehicles.

(17) "Building materials" includes lumber, windows, and other materials used in the construction or repair of improvements to real property.

**Credits**
Added by Acts 1973, 63rd Leg., p. 322, ch. 143, § 1, eff. May 21, 1973. Amended by Acts 1975, 64th Leg., p. 149, ch. 62, § 1, eff. Sept. 1, 1975; Acts 1977, 65th Leg., p. 600, ch. 216, § 1, eff. May 23, 1977; Acts 1979, 66th Leg., p. 1327, ch. 603, § 2, eff. Aug. 27, 1979; Acts 1983, 68th Leg., p. 4943, ch. 883, §§ 2, 3, eff. Aug. 29, 1983; Acts 1995, 74th Leg., ch. 414, § 2, eff. Sept. 1, 1995; Acts 2007, 80th Leg., ch. 411, § 1, eff. Sept. 1, 2007; Acts 2017, 85th Leg., ch. 967 (S.B. 2065), § 1.001, eff. Sept. 1, 2017; Acts 2019, 86th Leg., ch. 759 (H.B. 1152), § 1, eff. Sept. 1, 2019.

V. T. C. A., Bus. & C. § 17.45, TX BUS & COM § 17.45
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 2. Competition and Trade Practices
            Chapter 17. Deceptive Trade Practices (Refs & Annos)
                Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

V.T.C.A., Bus. & C. § 17.46

§ 17.46. Deceptive Trade Practices Unlawful

Currentness

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

   (1) passing off goods or services as those of another;

   (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

   (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

   (4) using deceptive representations or designations of geographic origin in connection with goods or services;

   (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

   (6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

   (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

   (8) disparaging the goods, services, or business of another by false or misleading representation of facts;

   (9) advertising goods or services with intent not to sell them as advertised;

(10) advertising goods or services with intent not to supply a reasonable expectable public demand, unless the advertisements disclosed a limitation of quantity;

(11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

(14) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction;

(15) basing a charge for the repair of any item in whole or in part on a guaranty or warranty instead of on the value of the actual repairs made or work to be performed on the item without stating separately the charges for the work and the charge for the warranty or guaranty, if any;

(16) disconnecting, turning back, or resetting the odometer of any motor vehicle so as to reduce the number of miles indicated on the odometer gauge;

(17) advertising of any sale by fraudulently representing that a person is going out of business;

(18) advertising, selling, or distributing a card which purports to be a prescription drug identification card issued under Section 4151.152, Insurance Code, in accordance with rules adopted by the commissioner of insurance, which offers a discount on the purchase of health care goods or services from a third party provider, and which is not evidence of insurance coverage, unless:

   (A) the discount is authorized under an agreement between the seller of the card and the provider of those goods and services or the discount or card is offered to members of the seller;

   (B) the seller does not represent that the card provides insurance coverage of any kind; and

   (C) the discount is not false, misleading, or deceptive;

(19) using or employing a chain referral sales plan in connection with the sale or offer to sell of goods, merchandise, or anything of value, which uses the sales technique, plan, arrangement, or agreement in which the buyer or prospective buyer is offered the opportunity to purchase merchandise or goods and in connection with the purchase receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for furnishing to the seller the names of other prospective buyers if receipt of the compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchases the merchandise or goods;

(20) representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve, provided, however, that nothing in this subchapter shall be construed to expand the implied warranty of merchantability as defined in Sections 2.314 through 2.318 and Sections 2A.212 through 2A.216 to involve obligations in excess of those which are appropriate to the goods;

(21) promoting a pyramid promotional scheme, as defined by Section 17.461;

(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced;

(23) filing suit founded upon a written contractual obligation of and signed by the defendant to pay money arising out of or based on a consumer transaction for goods, services, loans, or extensions of credit intended primarily for personal, family, household, or agricultural use in any county other than in the county in which the defendant resides at the time of the commencement of the action or in the county in which the defendant in fact signed the contract; provided, however, that a violation of this subsection shall not occur where it is shown by the person filing such suit that the person neither knew or had reason to know that the county in which such suit was filed was neither the county in which the defendant resides at the commencement of the suit nor the county in which the defendant in fact signed the contract;

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

(25) using the term "corporation," "incorporated," or an abbreviation of either of those terms in the name of a business entity that is not incorporated under the laws of this state or another jurisdiction;

(26) selling, offering to sell, or illegally promoting an annuity contract under Chapter 22, Acts of the 57th Legislature, 3rd Called Session, 1962 (Article 6228a-5, Vernon's Texas Civil Statutes), with the intent that the annuity contract will be the subject of a salary reduction agreement, as defined by that Act, if the annuity contract is not an eligible qualified investment under that Act;

(27) subject to Section 17.4625, taking advantage of a disaster declared by the governor under Chapter 418, Government Code, or by the president of the United States by:

(A) selling or leasing fuel, food, medicine, lodging, building materials, construction tools, or another necessity at an exorbitant or excessive price; or

(B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel, food, medicine, lodging, building materials, construction tools, or another necessity;

(28) using the translation into a foreign language of a title or other word, including "attorney," "immigration consultant," "immigration expert," "lawyer," "licensed," "notary," and "notary public," in any written or electronic material, including an

advertisement, a business card, a letterhead, stationery, a website, or an online video, in reference to a person who is not an attorney in order to imply that the person is authorized to practice law in the United States;

(29) delivering or distributing a solicitation in connection with a good or service that:

(A) represents that the solicitation is sent on behalf of a governmental entity when it is not; or

(B) resembles a governmental notice or form that represents or implies that a criminal penalty may be imposed if the recipient does not remit payment for the good or service;

(30) delivering or distributing a solicitation in connection with a good or service that resembles a check or other negotiable instrument or invoice, unless the portion of the solicitation that resembles a check or other negotiable instrument or invoice includes the following notice, clearly and conspicuously printed in at least 18-point type:

"SPECIMEN-NON-NEGOTIABLE";

(31) in the production, sale, distribution, or promotion of a synthetic substance that produces and is intended to produce an effect when consumed or ingested similar to, or in excess of, the effect of a controlled substance or controlled substance analogue, as those terms are defined by Section 481.002, Health and Safety Code:

(A) making a deceptive representation or designation about the synthetic substance; or

(B) causing confusion or misunderstanding as to the effects the synthetic substance causes when consumed or ingested;

(32) a licensed public insurance adjuster directly or indirectly soliciting employment, as defined by Section 38.01, Penal Code, for an attorney, or a licensed public insurance adjuster entering into a contract with an insured for the primary purpose of referring the insured to an attorney without the intent to actually perform the services customarily provided by a licensed public insurance adjuster, provided that this subdivision may not be construed to prohibit a licensed public insurance adjuster from recommending a particular attorney to an insured;

(33) owning, operating, maintaining, or advertising a massage establishment, as defined by Section 455.001, Occupations Code, that:

(A) is not appropriately licensed under Chapter 455, Occupations Code, or is not in compliance with the applicable licensing and other requirements of that chapter; or

(B) is not in compliance with an applicable local ordinance relating to the licensing or regulation of massage establishments; or

(34) a warrantor of a vehicle protection product warranty using, in connection with the product, a name that includes "casualty," "surety," "insurance," "mutual," or any other word descriptive of an insurance business, including property or casualty insurance, or a surety business.

(c)(1) It is the intent of the legislature that in construing Subsection (a) of this section in suits brought under Section 17.47 of this subchapter the courts to the extent possible will be guided by Subsection (b) of this section and the interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. § 45(a)(1) ].

(2) In construing this subchapter the court shall not be prohibited from considering relevant and pertinent decisions of courts in other jurisdictions.

(d) For the purposes of the relief authorized in Subdivision (1) of Subsection (a) of Section 17.50 of this subchapter, the term "false, misleading, or deceptive acts or practices" is limited to the acts enumerated in specific subdivisions of Subsection (b) of this section.

**Credits**

Added by Acts 1973, 63rd Leg., p. 322, ch. 143, § 1, eff. May 21, 1973. Amended by Acts 1977, 65th Leg., p. 601, ch. 216, §§ 2, 3, eff. May 23, 1977; Acts 1977, 65th Leg., p. 892, ch. 336, § 1, eff. Aug. 29, 1977; Acts 1979, 66th Leg., p. 1327, ch. 603, § 3, eff. Aug. 27, 1979; Acts 1987, 70th Leg., ch. 280, § 1, eff. Sept. 1, 1987; Acts 1993, 73rd Leg., ch. 570, § 6, eff. Sept. 1, 1993; Acts 1995, 74th Leg., ch. 414, § 3, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 463, § 1, eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 962, § 1, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1229, § 27, eff. June 1, 2002; Acts 2003, 78th Leg., ch. 1276, § 4.001(a), eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 728, § 11.101, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 1230, § 26, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 1023 (H.B. 1265), § 1, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 1080 (H.B. 2573), § 1, eff. Sept. 1, 2015; Acts 2017, 85th Leg., ch. 324 (S.B. 1488), § 3.001, eff. Sept. 1, 2017; Acts 2017, 85th Leg., ch. 858 (H.B. 2552), § 1, eff. Sept. 1, 2017; Acts 2017, 85th Leg., ch. 967 (S.B. 2065), §§ 1.002, 2.001, eff. Sept. 1, 2017; Acts 2019, 86th Leg., ch. 203 (H.B. 2820), § 2.01, eff. Sept. 1, 2019; Acts 2019, 86th Leg., ch. 467 (H.B. 4170), § 3.001, eff. Sept. 1, 2019; Acts 2019, 86th Leg., ch. 759 (H.B. 1152), § 2, eff. Sept. 1, 2019.

V. T. C. A., Bus. & C. § 17.46, TX BUS & COM § 17.46
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix – Tab 5

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code
    Title 11. Personal Identity Information
      Subtitle A. Identifying Information
        Chapter 509. Use of Digital Services by Minors

V.T.C.A., Bus. & C. T. 11, Subt. A, Ch. 509, Refs & Annos
Currentness

V. T. C. A., Bus. & C. T. 11, Subt. A, Ch. 509, Refs & Annos, TX BUS & COM T. 11, Subt. A, Ch. 509, Refs & Annos
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 11. Personal Identity Information (Refs & Annos)
            Subtitle A. Identifying Information
                Chapter 509. Use of Digital Services by Minors (Refs & Annos)
                    Subchapter A. General Provisions

V.T.C.A., Bus. & C. § 509.001

§ 509.001. Definitions

Currentness

In this chapter:

(1) "Digital service" means a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity.

(2) "Digital service provider" means a person who:

(A) owns or operates a digital service;

(B) determines the purpose of collecting and processing the personal identifying information of users of the digital service; and

(C) determines the means used to collect and process the personal identifying information of users of the digital service.

(3) "Harmful material" has the meaning assigned by Section 43.24, Penal Code.

(4) "Known minor" means a person that a digital service provider knows to be a minor.

(5) "Minor" means a child who is younger than 18 years of age who has not had the disabilities of minority removed for general purposes.

(6) "Personal identifying information" means any information, including sensitive information, that is linked or reasonably linkable to an identified or identifiable individual. The term includes pseudonymous information when the information is used by a controller or processor in conjunction with additional information that reasonably links the information to an identified or identifiable individual. The term does not include deidentified information or publicly available information.

(7) "Verified parent" means the parent or guardian of a known minor whose identity and relationship to the minor have been verified by a digital service provider under Section 509.101.

**Credits**

Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.001, TX BUS & COM § 509.001
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 11. Personal Identity Information (Refs & Annos)
            Subtitle A. Identifying Information
                Chapter 509. Use of Digital Services by Minors (Refs & Annos)
                    Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.051

§ 509.051. Digital Service Provider Duty to Register Age of User

Currentness

(a) A digital service provider may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the digital service provider.

(b) A person who registers the person's age as younger than 18 years of age is considered to be a known minor to the digital service provider until after the person's 18th birthday.

(c) A digital service provider may not allow a person who registers the person's age to alter the person's registered age, unless the alteration process involves a commercially reasonable review process.

(d) A minor is considered to be a known minor to a digital service provider if:

   (1) the minor registers the minor's age under Section 509.051 as younger than 18 years of age; or

   (2) the minor's parent or guardian, including a verified parent:

      (A) notifies a digital service provider that the minor is younger than 18 years of age;

      (B) successfully disputes the registered age of the minor; or

      (C) performs another function of a parent or guardian under this chapter.

(e) If a minor is a known minor, or if the minor's parent or guardian, including a verified parent, takes an action under Subsection (a), a digital service provider:

   (1) is considered to have actual knowledge that the minor is younger than 18 years of age; and

(2) shall treat the minor as a known minor under this chapter.

**Credits**

Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.051, TX BUS & COM § 509.051

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle A. Identifying Information
        Chapter 509. Use of Digital Services by Minors (Refs & Annos)
          Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.052

§ 509.052. Digital Service Provider Duties Relating to Agreement With Minor

Currentness

Unless a verified parent provides otherwise under Section 509.102, a digital service provider that enters into an agreement with a known minor for access to a digital service:

  (1) shall:

    (A) limit collection of the known minor's personal identifying information to information reasonably necessary to provide the digital service; and

    (B) limit use of the known minor's personal identifying information to the purpose for which the information was collected; and

  (2) may not:

    (A) allow the known minor to make purchases or engage in other financial transactions through the digital service;

    (B) share, disclose, or sell the known minor's personal identifying information;

    (C) use the digital service to collect the known minor's precise geolocation data; or

    (D) use the digital service to display targeted advertising to the known minor.

**Credits**
Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.052, TX BUS & COM § 509.052
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Business and Commerce Code (Refs & Annos)
      Title 11. Personal Identity Information (Refs & Annos)
         Subtitle A. Identifying Information
            Chapter 509. Use of Digital Services by Minors (Refs & Annos)
               Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.053

§ 509.053. Digital Service Provider Duty to Prevent Harm to Known Minors

Currentness

(a) In relation to a known minor's use of a digital service, a digital service provider shall develop and implement a strategy to prevent the known minor's exposure to harmful material and other content that promotes, glorifies, or facilitates:

   (1) suicide, self-harm, or eating disorders;

   (2) substance abuse;

   (3) stalking, bullying, or harassment; or

   (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse.

(b) A strategy developed under Subsection (a):

   (1) must include:

      (A) creating and maintaining a comprehensive list of harmful material or other content described by Subsection (a) to block from display to a known minor;

      (B) using filtering technology and other protocols to enforce the blocking of material or content on the list under Paragraph (A);

      (C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described by Subsection (a);

      (D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;

(E) performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;

(F) making available to users a comprehensive description of the categories of harmful material or other content described by Subsection (a) that will be filtered; and

(G) except as provided by Section 509.058, making available the digital service provider's algorithm code to independent security researchers; and

(2) may include:

(A) engaging a third party to rigorously review the digital service provider's content filtering technology;

(B) participating in industry-specific partnerships to share best practices in preventing access to harmful material or other content described by Subsection (a); or

(C) conducting periodic independent audits to ensure:

(i) continued compliance with the digital service provider's strategy; and

(ii) efficacy of filtering technology and protocols used by the digital service provider.

**Credits**

Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.053, TX BUS & COM § 509.053
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Business and Commerce Code (Refs & Annos)
     Title 11. Personal Identity Information (Refs & Annos)
       Subtitle A. Identifying Information
         Chapter 509. Use of Digital Services by Minors (Refs & Annos)
           Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.054

§ 509.054. Digital Service Provider Duty to Create Parental Tools

Currentness

(a) A digital service provider shall create and provide to a verified parent parental tools to allow the verified parent to supervise the verified parent's known minor's use of a digital service.

(b) Parental tools under this section must allow a verified parent to:

(1) control the known minor's privacy and account settings;

(2) alter the duties of a digital service provider under Section 509.052 with regard to the verified parent's known minor;

(3) if the verified parent alters the duty of a digital service provider under Section 509.052(2)(A), restrict the ability of the verified parent's known minor to make purchases or engage in financial transactions; and

(4) monitor and limit the amount of time the verified parent's known minor spends using the digital service.

**Credits**
Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.054, TX BUS & COM § 509.054
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle A. Identifying Information
        Chapter 509. Use of Digital Services by Minors (Refs & Annos)
          Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.055

§ 509.055. Digital Service Provider Duties Regarding Advertising and Marketing

Currentness

A digital service provider shall make a commercially reasonable effort to prevent advertisers on the digital service provider's digital service from targeting a known minor with advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor in this state to use or engage in.

**Credits**

Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.055, TX BUS & COM § 509.055
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 11. Personal Identity Information (Refs & Annos)
            Subtitle A. Identifying Information
                Chapter 509. Use of Digital Services by Minors (Refs & Annos)
                    Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.056

§ 509.056. Use of Algorithms

Currentness

A digital service provider that uses algorithms to automate the suggestion, promotion, or ranking of information to known minors on the digital service shall:

(1) make a commercially reasonable effort to ensure that the algorithm does not interfere with the digital service provider's duties under Section 509.053; and

(2) disclose in the digital service provider's terms of service, privacy policy, or similar document, in a clear and accessible manner, an overview of:

(A) the manner in which the digital service uses algorithms to provide information or content;

(B) the manner in which algorithms promote, rank, or filter information or content; and

(C) the personal identifying information used as inputs to provide information or content.

**Credits**
Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.056, TX BUS & COM § 509.056
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle A. Identifying Information
        Chapter 509. Use of Digital Services by Minors (Refs & Annos)
          Subchapter B. Digital Service Provider Duties and Prohibitions

V.T.C.A., Bus. & C. § 509.057

§ 509.057. Digital Service Provider Duty as to Harmful Material

Currentness

(a) A digital service provider as defined by Section 509.001 that knowingly publishes or distributes material, more than one-third of which is harmful material or obscene as defined by Section 43.21, Penal Code, must use a commercially reasonable age verification method to verify that any person seeking to access content on or through the provider's digital service is 18 years of age or older.

(b) If a person seeking to access content on or through the digital service of a provider for which age verification is required under this section is not 18 years of age or older, the digital service provider may not enter into an agreement with the person for access to the digital service.

**Credits**

Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.057, TX BUS & COM § 509.057
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document** 

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle A. Identifying Information
        Chapter 509. Use of Digital Services by Minors (Refs & Annos)
          Subchapter C. Verified Parents

V.T.C.A., Bus. & C. § 509.101

§ 509.101. Verification of Parent or Guardian

Currentness

(a) A digital service provider shall verify, using a commercially reasonable method and for each person seeking to perform an action on a digital service as a minor's parent or guardian:

(1) the person's identity; and

(2) the relationship of the person to the known minor.

(b) A digital service provider shall provide a process by which a person who has been verified under Subsection (a) as the parent or guardian of a known minor may participate in the digital service as the known minor's verified parent as provided by this chapter.

**Credits**
Added by Acts 2023, 88th Leg., ch. 795 (H.B. 18), § 2.01, eff. Sept. 1, 2024.

V. T. C. A., Bus. & C. § 509.101, TX BUS & COM § 509.101
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix – Tab 6

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment I. Religion; Speech and the Press; Assembly; Petition

U.S.C.A. Const. Amend. I

Amendment I. Establishment of Religion; Free Exercise of Religion; Freedom
of Speech and the Press; Peaceful Assembly; Petition for Redress of Grievances

Currentness

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const Amend. I--Establishment clause; Free Exercise clause>

<USCA Const Amend. I--Free Speech clause; Free Press clause>

<USCA Const Amend. I--Assembly clause; Petition clause>

U.S.C.A. Const. Amend. I, USCA CONST Amend. I
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix – Tab 7

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection; Apportionment of
      Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV

AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE PROCESS; EQUAL PROTECTION;
APPOINTMENT OF REPRESENTATION; DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

<Section 1 of this amendment is further displayed in separate documents according to subject matter,>

<see USCA Const Amend. XIV, § 1-Citizens>

<see USCA Const Amend. XIV, § 1-Privileges>

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV, USCA CONST Amend. XIV
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Brandon Duke
Bar No. 24094476
ommsvc2@omm.com
Envelope ID: 108205774
Filing Code Description: Original Proceeding Petition
Filing Description: Petition for Writ of Mandamus
Status as of 11/19/2025 7:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rebecca Hermann | | rebecca.herrmann@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Richard Mccutcheon | | richard.mccutcheon@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Megan Crowley | | mcrowley@cov.com | 11/18/2025 7:46:49 PM | SENT |
| Calendar Litigation | | litigationcalendar@omm.com | 11/18/2025 7:46:49 PM | SENT |
| Jerry Bergman | | jerry.bergman@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Hannah Campus | | hannah.campus@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Adam Laxalt | | alaxalt@cooperkirk.com | 11/18/2025 7:46:49 PM | SENT |
| David Thompson | | dthompson@cooperkirk.com | 11/18/2025 7:46:49 PM | SENT |
| Brian Barnes | | bbarnes@cooperkirk.com | 11/18/2025 7:46:49 PM | SENT |
| Adam Holtz | | adam.holtz@oag.texas.gov | 11/18/2025 7:46:49 PM | SENT |
| Brandon Duke | | bduke@omm.com | 11/18/2025 7:46:49 PM | SENT |
| Trial Court | | 250.submission@traviscountytx.gov | 11/18/2025 7:46:49 PM | SENT |